IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 27, 2004

# STATE OF TENNESSEE v. ANTONIO FULLER AND MARCELLUS BETTY

**Appeal from the Criminal Court for Davidson County**
**No. 2001-A-276    J. Randall Wyatt, Jr., Judge**

---

**No. M2002-02377-CCA-R3-CD - Filed July 13, 2004**

---

The defendants, Antonio Fuller and Marcellus Betty, were each convicted of one count of aggravated burglary, one count of aggravated robbery, two counts of especially aggravated kidnapping, one count of evading arrest, and one count of reckless endangerment. The trial court sentenced defendant Fuller, a Range II offender, to ten years for aggravated burglary, eighteen years for aggravated robbery, thirty-five years for each especially aggravated kidnapping, seven years for evading arrest, and four years for reckless endangerment and ordered partially consecutive service for an effective sentence of fifty-six years. The trial court sentenced defendant Betty, a Range I offender, to six years for aggravated burglary, twelve years for aggravated robbery, twenty-five years for each especially aggravated kidnapping, four years for evading arrest, and two years for reckless endangerment. The terms for especially aggravated kidnapping were ordered to be served concurrently to each other and consecutively to the other sentences, which are to be served consecutively, for an effective sentence of forty-nine years. In this appeal, Fuller asserts that (1) the evidence is insufficient to support his convictions; (2) his conviction for especially aggravated kidnapping of one of the victims violates the rule established in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991); (3) the trial court erred by refusing to provide a range of punishment instruction to the jury; and (4) the trial court misapplied certain enhancement factors and should not have imposed consecutive sentencing. Betty contends (1) that the trial court erred by refusing to sever his case from Fuller's; (2) that the evidence is insufficient to support his convictions; (3) that the trial court erred by not granting a mistrial when the state failed to disclose a recording of a 911 call; (4) that the trial court erred by failing to merge the convictions for aggravated robbery and especially aggravated kidnapping; (5) that the trial court misapplied certain enhancement and mitigating factors; and (6) that the trial court erred by imposing consecutive sentencing. Because each of the defendants' convictions for the especially aggravated kidnapping of one of the victims violates the rule established in Anthony, they are reversed and dismissed. Further, because the sentences for especially aggravated kidnapping were ordered to be served concurrently to each other, no modification of the effective sentence is necessary. Otherwise, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed in Part; Reversed and Dismissed in Part**

GARY R. WADE, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Jeff Goldtrap (at trial) and Dwight E. Scott (on appeal), Nashville, Tennessee, for the appellant, Antonio Fuller.

Justin Johnson (at trial) and Mike J. Urquhart (on appeal), Nashville, Tennessee, for the appellant, Marcellus D. Betty.

Paul G. Summers, Attorney General & Reporter; Thomas E. Williams, III, Assistant Attorney General; and Dan Hamm and Sharon Brox, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In December of 2000, Quantrissa Sherrell Woods resided in Goodlettsville with her children and her boyfriend, George Woods, whom she later married. During the early morning hours of December 22, only ten days after the birth of her son, two masked, armed gunmen broke into their residence. The first of the gunmen, whom Ms. Woods described as tall and slim, walked to her side of the bed and aimed "a large rifle" at her and the newborn child. A second man, whom Ms. Woods described as short and "pudgy," walked to the other side of the bed, pointing a shotgun at her boyfriend. The taller of the two assailants, who was later identified as the defendant Betty, demanded "dope" and "money." Ms. Woods responded, "[W]e don't have any drugs or money. You know, we just work. All the money we have is up on the dresser, about seventy dollars." Betty, who threatened to kill them if they did not give him money and drugs, then asked, "[W]here is Little Jason?"

Realizing at that point that the perpetrators had mistakenly entered the wrong apartment, Woods informed the men that another individual who lived in the complex was a cousin to "Little Jason" and also drove a car that was identical to their own vehicle. As Woods offered to show the perpetrators where "Little Jason's" cousin lived, Betty placed the baby's pacifier in the baby's mouth in an effort to stop his crying. When he bent down, however, his mask fell off and Ms. Woods was able to see his face. Betty then ordered the other assailant, who was later identified as the defendant Fuller, to tape the victims. Ms. Woods hands and mouth were bound with duct tape. Woods' hands and feet were taped and he was forced outside the apartment.

After the assailants took Woods from the apartment, Ms. Woods five-year-old daughter ran into the bedroom. Fearful because Betty had warned her that he was aware that her daughter was in the apartment, Ms. Woods instructed her daughter to return to her room and then dialed 911. She hung up before her call was answered because she feared that one of the assailants might still be in the apartment. When the dispatcher returned the call shortly thereafter, Ms. Woods answered the phone and "told everything that I kn[e]w in that split second . . . and got back into the bed, the way

that I was when they left out." Betty then returned with Woods, ordered him into the bed, and warned, "I know your mother, and I know your mother. And I know where they live. And I'll kill you-all. And I'll kill them if you mess my sting up. . . . Don't call the police. Don't do anything. Don't mess my sting up or I'll kill you." Before leaving, Betty placed the barrel of his gun into each victim's mouth and again threatened to kill them. When the assailants left, the Woodses freed themselves from the tape, packed a bag, and gathered their children. They were running from the apartment when the police arrived.

At trial, Ms. Woods identified defendant Betty as the taller assailant but acknowledged that she never saw the face of the other perpetrator. During cross-examination, she conceded that she had not identified Betty as one of the assailants prior to the trial and that she could not remember what either assailant wore that night. Ms. Woods recalled that Betty, who was the only one of the two who spoke during the burglary, shouted orders to his co-perpetrator.

George Woods provided similar testimony. While in bed on the night of the offense, he heard a loud bang followed by his girlfriend's scream. When he awoke, he saw two masked gunmen standing over the bed, one armed with a rifle and the shorter of the two in possession of a shotgun. According to Woods, the taller assailant demanded money and drugs, asked if he owned the black car parked in front of the apartment, and inquired whether "Little Jason" was there. Woods testified that after realizing that his assailants were in the wrong apartment, he explained that "Little Jason's" cousin lived in the same complex and drove a car identical to his. Woods recalled offering to show them where the cousin lived.

After binding the victims with duct tape, the assailants forced Woods outside and into the front seat of a white, two-door Ford Escort. The shorter assailant drove and the taller of the men was in the back seat. Woods showed them the apartment that belonged to "Little Jason's" cousin and, as they drove back to his apartment, Woods saw the face of the shorter assailant, who had pushed up his mask in order to drive. He identified the shorter man, who had gold teeth, as the defendant Fuller. Woods remembered that Fuller appeared nervous in the car when Betty threatened to shoot him. Upon returning to the apartment, the taller perpetrator escorted Woods up the stairs and ordered him to get back into his bed. He then warned them not to "mess up his sting, because it was Christmastime." Woods confirmed his wife's testimony that the taller assailant placed his rifle in each of their mouths. Woods testified that after the defendants left, he put some belongings in a bag, got the children, and was leaving the apartment with them when the police arrived.

Lieutenant Patrick Taylor of the Metro Police Department and two officers of the Goodlettsville Police Department responded to the 911 call, entered the Woods' apartment, and found Ms. Woods, whom Lieutenant Taylor described as hysterical, running toward the door. After securing the apartment unit, Lieutenant Taylor heard over his radio that a small, white car had wrecked nearby while being chased by other officers.

As Lieutenant Taylor secured the Woods' apartment, Metro Police Officer Eric Mumaw observed a white vehicle matching the description of the suspect's vehicle leaving the complex at

a high rate of speed. As the car passed, Officer Mumaw shined his spotlight into the car and made eye contact with the driver, who appeared to be grinning. Officer Mumaw activated his blue lights and followed the car. When the driver failed to stop, he activated his sirens and notified dispatch that he was in pursuit. He followed the suspect vehicle through both a residential area and a business area, where pedestrians were present, at speeds of over one hundred miles an hour before the white car wrecked in a curve. When Officer Mumaw approached the defendants, each of whom was lying on the ground, Fuller grabbed the shotgun and attempted to point it at him. Officer Mumaw kicked the shotgun away and then placed handcuffs on each of the suspects. According to Officer Mumaw, he placed defendant Fuller into his patrol car and transported him to the police station. He later learned that defendant Betty, the other person in the car, was taken to the hospital.

Metro Police Officer Chris Barber followed Officer Mumaw during the chase and saw that both Fuller and Betty had been ejected from the car. He also saw two weapons on the ground nearby. As Officer Barber got out of his vehicle, Betty was trying to stand.

Detective Norris Tarkington of the Metro Robbery Unit testified that he searched Fuller and discovered a roll of duct tape in the pocket of his jacket. Detective Tarkington collected Fuller's clothing, which consisted of a black pullover, sweatpants, a blue Titans bandanna, a multi-colored jacket, and a jersey-type shirt with the logo "Rest in Peace, Fuller, Rest in Peace." He did not collect any of Betty's clothing and, because the victims indicated that both defendants wore gloves during the burglary, he did not request fingerprinting or other forensic examination of the crime scene. During cross-examination, Detective Tarkington recalled that Fuller informed him that Betty was wearing gray pants and a blue coat and conceded that, in retrospect, he should have collected Betty's clothes as evidence.

The defendant Betty, testifying in his own defense, claimed that on the afternoon before the offenses, a friend had dropped him off at his cousin's apartment, which was located in the same complex as the Woods' apartment. He contended that later on that same evening, he telephoned Fuller asking for a ride and Fuller agreed. Betty claimed that when Fuller had not arrived by midnight, he telephoned him again and Fuller responded that he would be there shortly, instructing Betty to be ready because he "was just going to toot the horn." He stated that Fuller arrived shortly after 1:00 A.M. and blew his car horn seven times. Betty testified that when he arrived at the car, Fuller, who had a Tennessee Titans bandanna around his neck, was sweating . He explained that he then heard sirens and saw a police car following them. He claimed that he asked Fuller to stop but Fuller refused, telling him that there were drugs in the car. Betty recalled traveling at a high rate of speed before wrecking and being ejected from the vehicle. He denied participation in any of the offenses.

During cross-examination, Betty claimed that he did not see any guns in Fuller's vehicle. He admitted that he was the only other person in the car and acknowledged that he had not seen anyone get out of the car before he got inside. Betty recalled that Fuller appeared worried. He contended that his clothes were taken when he was booked into the jail and that later, when he was transferred to a regional correctional center, he had donated the clothes to Goodwill.

The defendant Fuller also testified, claiming that he was eating dinner in Bill Martin's store when Betty, whom he did not know very well, asked if an individual named "Jason" would like to buy "some automatics," which he interpreted to be guns. Fuller stated that he referred Betty to "Jason" regarding the possible sale of "the automatics," but admitted giving Betty a ride before driving to his janitorial job, conceding that he had agreed to try to sell them for Betty. Fuller contended that when his shift ended at midnight, he stopped for Betty, who accompanied him to another residence to pick up the guns. He claimed that he then drove to the apartment complex where "Jason" lived, parking next to a black Grand Prix. Fuller testified that he telephoned a man named "Ricky," who was "Jason's" cousin, to inform him that they were outside with the guns. He claimed that when no one answered, Betty said, "I can just go on, if you want to go on in, I know he's got plenty of money and plenty of dope and stuff." According to Fuller, he responded, "I can't do that, [be]cause he . . . know[s] me. He'll come looking for me." Fuller insisted that he refused Betty's instructions to "grab the pump and watch the door." He alleged that Betty then got out of the car, walked to the door, and listened for noise inside. Fuller testified that Betty returned to the car, pointed a gun him, and ordered him to take the other gun and follow him inside.

Fuller claimed that he told Betty that he was at the wrong apartment but Betty kicked in the door anyway and went upstairs. According to Fuller, he waited fifteen seconds and followed Betty only because he did not believe anyone was at the residence; when he got to the top of the stairs, however, he saw the Woodses lying in their bed and heard Betty demanding money and dope. Fuller denied pointing a gun at Woods and insisted that he stood idly in the doorway while Betty bound the victims with duct tape. Fuller claimed that he went outside and laid the shotgun onto the ground before Betty, accompanied by Woods, walked outside and said, "[H]e's fixing to show me the real house." He contended that Betty placed Woods in the front seat on the passenger side and then ordered him to "get the pump" and drive the car. Fuller testified that when he placed the shotgun on the seat between him and Woods, Betty threatened to shoot him. It was his contention that after Woods showed them the correct residence, they returned to the Woods' residence, where Betty took Woods inside, taking the keys and leaving him in the car. According to Fuller, Betty returned to the car and threatened to kill him if he told anyone what had occurred. Claiming that Betty put the roll of duct tape in his jacket pocket, Fuller contended that when they saw the police car, Betty placed the gun to his head and ordered him to drive faster. Fuller, who made a statement to Detective Tarkington after his arrest, insisted that he did not initially tell police the truth only because he was afraid of Betty.

During cross-examination by Betty's counsel, Fuller acknowledged filing a complaint at the jail which resulted in Betty's placement in protective custody. During cross-examination by the state, Fuller admitted entering the Woods' residence armed with a shotgun even after learning from Betty that he intended to commit a robbery. Fuller conceded that Betty did not threaten him while they were inside the Woods' residence. Fuller recalled that the Woodses were taped after Betty had taken their money from the dresser. He explained that he did not run away because the car he was driving was registered in his brother's name and he did not want his brother to get into trouble.

## I

Each of the defendants asserts that the evidence is insufficient to support the convictions. Fuller contends that he participated in the crimes only because Betty had threatened to kill him and that he should have been acquitted on that basis. Betty contends that the state failed to prove his identity as one of the perpetrators. The state submits that the evidence is sufficient to support the convictions.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

As indicated, Fuller did not contest the presence of the elements of any of the offenses and instead offers a blanket denial of responsibility, arguing that he committed the crimes while acting under duress. See Tenn. Code Ann. § 39-11-504; State v. Culp, 900 S.W.2d 707 (Tenn. Crim. App. 1994). Fuller testified that he participated in each of the offenses only because Betty had threatened his life if he failed to cooperate. The only explanation he gave for continuing to participate, despite at least two opportunities to leave, was that the car he was driving was registered in his brother's name and he did not want to cause trouble for his brother. In contrast, each of the victims testified that Fuller was an active participant in the crimes, holding a gun on Woods and binding each of the victims. Officer Mumaw testified that Fuller grinned directly at him before speeding out of the apartment complex. There was proof that after the wreck, Fuller grabbed one of the guns and attempted to point it at Officer Mumaw. When given the opportunity, Fuller did not inform the authorities that Betty had forced him to participate in the crime. While Woods acknowledged that Betty yelled at Fuller while the three men were inside the car, he also indicated that Betty had done so only because Fuller had placed his gun too close to Woods before driving away. In any event, the jury, as the judge of the facts, was free to draw any reasonable inferences from this testimony and acted within its prerogative by determining that Fuller had provided mendacious testimony. See Tenn. Const. art. I, § 19; Byrge, 575 S.W.2d at 295. Because the trial court properly instructed the jury on the defense of duress, see Tenn. Code Ann. § 39-11-504, Fuller was not deprived of the benefit of his defense theory. Under these circumstances, it is our view that the evidence is sufficient to support the convictions.

Similarly, Betty does not argue that the state failed to prove the elements of aggravated burglary, aggravated robbery, or especially aggravated kidnapping, but asserts that it failed to establish his identity as the perpetrator. He argues that because the victims indicated that the perpetrators wore black clothing and other evidence established that he wore gray pants and a green top, the state failed to adequately establish that he committed the crimes. At trial, Ms. Woods, who had an opportunity to view the face of the taller perpetrator, conclusively identified Betty as her attacker. Although Betty testified that he had visited his cousin all day and that Fuller offered a ride after the robbery, he produced no witness to support his claim. This court has previously held that the testimony of a victim identifying the perpetrator is sufficient to support a conviction. State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993). "Inconsistency, inaccuracy and omissions in the description of a defendant by a witness who is otherwise able to positively identify the defendant are questions for the jury to consider in determining the weight to be given the testimony." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). The jury accredited the testimony of the state's witnesses. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). In our view, the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that the defendant Betty committed the crimes.

With regard to his convictions for evading arrest and reckless endangerment, Betty asserts that he should not have been convicted of these offenses because he was not driving the automobile. While he acknowledges the principle of criminal responsibility, he argues that it cannot apply to the offense of evading arrest. Betty has failed to cite any authority for his argument and it is, therefore, waived. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Furthermore, he would not be entitled to relief upon the merits of the issue.

Tennessee Code Annotated section 39-16-603 provides that "[i]t is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from such officer to bring the vehicle to a stop." Tenn. Code Ann. § 39-16-603(b). The statute further provides that the offense is a Class D felony if the "flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties[.]" Tenn. Code Ann. § 39-16-603(b)(3). Reckless endangerment occurs when a person "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). When committed with a deadly weapon, reckless endangerment is a Class E felony. Tenn. Code Ann. § 39-13-103(b).

Tennessee Code Annotated section 39-11-401 provides that "[a] person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Generally, a person is criminally responsible for the conduct of another if:

> (1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense; [or]

-7-

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(1)-(2).

The proof at trial established that the defendants acted as compatriots in the attack on the Woodses. Each victim testified that Betty had acted as the spokesperson during the burglary and that Fuller did not speak at all. There was proof that Betty ordered Fuller to tape the victims. Further, Woods testified that Betty threatened to shoot Fuller while they were in the car. Under these circumstances, it is our view that the evidence supports Betty's convictions for evading arrest and reckless endangerment.

II

In a related issue, each of the defendants asserts that the conviction for the especially aggravated kidnapping of Ms. Woods is barred by the principle established in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). The state submits that because the confinement of Ms. Woods was beyond that necessary to commit the aggravated robbery, Anthony does not bar separate convictions.

In Anthony, our supreme court acknowledged that a period of confinement of the victim frequently accompanies such crimes as robbery and rape and established that whether a separate kidnapping conviction can be supported depends upon "whether the confinement, movement, or detention [was] essentially incidental to the accompanying felony." 817 S.W.2d at 305. In State v. Dixon, our high court clarified its ruling in Anthony:

> Anthony and its progeny, however, are not meant to provide the rapist a free kidnapping merely because he also committed rape. The Anthony decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery. Accordingly, any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping.

957 S.W.2d 532, 534-35 (Tenn. 1997). Where the confinement is beyond that necessary for the accompanying felony, the next inquiry is whether it (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Id. at 535.

Here, Ms. Woods testified that the defendants had already taken the seventy dollars from the dresser before they bound her arms with duct tape. This court has held that where binding of the victim occurs after the commission of the crime, the confinement is necessarily beyond that necessary for the commission of the crime. State v. Eric T. Armstrong, M2003-00762-CCA-R3-CD (Tenn. Crim. App., at Nashville, June 2, 2004); State v. Rashe Moore, No.

W2002-01195-CCA-R3-CD (Tenn. Crim. App., at Jackson, Dec. 3, 2003); State v. William Rhea Jackson, No. M2002-00762-CCA-R3-CD (Tenn. Crim. App., at Nashville, Mar. 27, 2003).

Our next inquiry is whether the confinement (1) prevented Ms. Woods from summoning help; (2) lessened the defendants' risk of detection; or (3) created a significant danger or increased Ms. Woods' risk of harm. See Dixon, 957 S.W.2d at 535. In this case, Ms. Woods' arms were bound behind her back and duct tape was placed over her mouth. Ms. Woods testified that the tape made it difficult to speak and, had she not licked her lips before the tape was placed over her mouth, she would have been unable to speak at all. She was, however, able to dial 911 and answer a return call. The police arrived in time to find the defendants leaving the parking lot. Thus, the binding of Ms. Woods' arms with duct tape did not prevent her from summoning help and did not lessen the defendant's risk of detection. Further, there was no specific proof that the binding created a significant danger or increased Ms. Woods' risk of harm. In our view, the convictions as to each defendant for the especially aggravated kidnapping of Ms. Woods violate the principles announced in Anthony and should be reversed and dismissed.

### III

Betty also contends that the trial court erred by denying his motion to sever his trial. The state submits that the trial court did not abuse its discretion by the joint trial.

The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and this court will not disturb the trial court's ruling absent clear abuse of that discretion. State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988). Rule 14 of the Tennessee Rules of Criminal Procedure governs severance of defendants and provides in pertinent part as follows:

> (c) Severance of Defendants.
> (1) If a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant, the court shall determine whether the State intends to offer the statement in evidence at trial. If so, the court shall require the prosecuting attorney to elect one of the following courses:
> (i) a joint trial at which the statement is not admitted into evidence or at which, if admitted, the statement would not constitute error; or
> (ii) a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been deleted, if, as deleted, the confession will not prejudice the moving defendant; or
> (iii) severance of the moving defendant.
> (2) The court, on motion of the State or on motion of the defendant other than under subdivision (c)(1), shall grant a severance of defendants if:
> (i) before trial, it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants; or

> (ii) during trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

Tenn. R. Crim. P. 14(c). Where a motion for severance has been denied, the test to be applied by this court in determining whether the trial court abused its discretion is whether the defendant was "clearly prejudiced" in his defense as a result of being tried with his co-defendant:

> The record must demonstrate that "the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of a severance became a judicial duty," before an accused is entitled to a reversal of his conviction.

Burton, 751 S.W.2d at 447 (citations omitted).

Prior to trial, Betty moved to sever his case from Fuller's asserting that his right of confrontation would be violated if the two were tried together and Fuller's confession were admitted into evidence. Citing Bruton v. United States, 391 U.S. 123 (1968), he argued that he would be prejudiced if Fuller's statement were produced at trial because it implicated him in the crimes. Betty asked that the trial court sever the cases, or, in the alternative, that the state agree not to use Fuller's statement as proof.

Initially, Betty has failed to include either a transcript of the hearing on the motion to sever or the trial court's order denying the motion. It is the duty of the appellant to prepare a complete and accurate record on appeal. Tenn. R. App. P. 24(b). The failure to prepare an adequate record for review of an issue often results in a waiver of that issue. Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997).

More importantly, Betty is not entitled to relief on the merits of his claim. As indicated, Betty asked that either the cases be severed or the state "agree not to use the statement in its case-in-chief at a joint trial because redaction would not be effective." The record establishes that the state agreed not to use Fuller's statement and did not make any reference to the statement at trial. Betty argues that he was prejudiced because he was "forced" to testify to answer the claim that he forced Fuller to participate in the crimes. This court disagrees. In our view, any prejudice Betty suffered as a result of the joint trial was not so clear that "the trial court's discretion ended and the granting of a severance became a judicial duty." Burton, 751 S.W.2d at 447.

IV

Betty next contends that the trial court erred by refusing to grant a mistrial when the state revealed the existence of an audiotape recording of Ms. Woods' telephone call to 911. The tape had not been provided as part of the discovery process. The state argues that the omission was not the fault of the state and that Betty did not suffer any prejudice because of the delayed disclosure of the audiotape.

"The entry of a mistrial is appropriate when the trial cannot continue for some reason, or if the trial does continue, a miscarriage of justice will occur." State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial is within the sound discretion of the trial court, and this court will not disturb the trial court's determination unless a clear abuse of discretion appears on the record. Id.

Here, Ms. Woods testified during direct examination that she had telephoned 911 after her husband was taken from the house. The prosecution contended that it had tried to get a copy of the audiotape recording of that call in advance of the trial but had been unable to do so. The prosecution further argued that it did not intend to use the tape at trial. The trial court subpoenaed a copy of the tape and it was made available to defense counsel on the following day. After giving counsel an opportunity to listen to the tape, the trial court agreed to allow Betty's counsel to recall Ms. Woods to question her about its contents. Betty's counsel asserted that the tape could have assisted his cross-examination of Ms. Woods regarding the type of clothing the perpetrators wore and that he had been prejudiced by the state's failure to turn it over prior to trial. Because Betty had the opportunity to re-examine Ms. Woods about the contents of the 911 tape and he chose not to take it, there was no prejudice occasioned by the delay. In our view, the trial court did not abuse its discretion.

V

Fuller asserts that the trial court erred by refusing to instruct the jury on the range of punishment for each of the offenses. The state submits that Tennessee Code Annotated section 40-35-201 specifically prohibits range-of-punishment instructions and there was, therefore, no error. Tennessee Code Annotated section 40-35-201 provides, in pertinent part, as follows:

> In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, section 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

Tenn. Code Ann. § 40-35-201(b). The current form of the statute, which was in effect at the time of trial, prohibits a jury instruction on the possible penalties for the charged offenses. Thus, the trial court correctly refused to instruct the jury on the range of punishment. See Dean v. State, 59 S.W.3d 663, 665 n.2 (Tenn. 2001)(observing that "[e]ffective May 18, 1998, [Tenn. Code Ann. § 40-35-201] was rewritten and now provides that the trial court may no longer instruct the jury with respect to the possible penalties for the charged offense or lesser included offenses"); see also State v. Travis J. Woods, No. E2001-1027-CCA-R3-CD (Tenn. Crim. App., at Knoxville, July 16, 2003) ("In 1998 the General Assembly amended section 40-35-201(b) to provide that such an instruction not be given in trials occurring after May 18, 1998."). In consequence, Fuller is not entitled to relief on this issue.

## VI

Each of the defendants argues that the trial court misapplied certain enhancement and mitigating factors and that it erred by ordering consecutive sentencing. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the midpoint. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the midpoint. Id. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence should then be reduced within the range by any weight assigned to the mitigating factors present. Id.

In calculating the sentence for a Class B, C, D, or E felony conviction, the presumptive sentence is the minimum in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

In arriving at the respective sentences, the trial court applied the following enhancement factors to each of the convictions for both of the defendants:

(1)     The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(3)     The offense involved more than one (1) victim;

(13)    The felony was committed while on bail (Fuller) or parole (Betty);

(10)    The defendant had no hesitation about committing a crime when the risk to human life was high; and

(16)    The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

See Tenn. Code Ann. § 40-35-114 (1997).[1]  As to Betty, the trial court also found enhancement factor (8), that the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community, applicable.  See Tenn. Code Ann. § 40-35-114(8) (1997).  The trial court did not apply any mitigating factors.

As to Fuller, the trial court imposed Range II sentences of ten years for aggravated burglary, eighteen years for aggravated robbery, thirty-five years for each especially aggravated kidnapping, seven years for evading arrest, and four years for reckless endangerment.  The court ordered that the sentences for especially aggravated kidnapping be served concurrently with each other but consecutively with the sentence for aggravated burglary.  Additionally, the sentences for evading arrest and reckless endangerment were ordered to be served consecutively to the sentences for especially aggravated kidnapping and to each other.  The sentence for aggravated robbery was ordered to be served concurrently with the sentences for aggravated burglary and especially aggravated kidnapping.  The effective sentence is, therefore, fifty-six years.

As to Betty, a Range I offender, the trial court imposed sentences of six years for aggravated burglary, twelve years for aggravated robbery, twenty-five years for each especially aggravated kidnapping, four years for evading arrest, and two years for reckless endangerment.  The trial court ordered that the sentences for especially aggravated kidnapping be served concurrently with each other and consecutively to the other sentences.  The remaining sentences are to be served consecutively.  The effective sentence is, therefore, forty-nine years.

Each of the defendants asserts that the trial court erred by applying enhancement factor (3), that the offense involved more than one victim.  In State v. McKnight, 900 S.W.2d 36 (Tenn. Crim. App. 1994), this court ruled that the multiple victim factor is not applicable when convictions are entered for each victim, as in this case.  See also State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (holding that the multiple victim enhancement factor cannot be applied when the defendant is convicted of separate offenses against each victim).  Moreover, although the Woods' children were present, they cannot be classified as "victims" for purposes of the application of this enhancement factor because they were not "injured, killed, [did not have] property stolen, [and did

---

[1]The sentencing hearing occurred prior to the effective date of the amendment to Tennessee Code Annotated section 40-35-114 that renumbered original enhancement factors (1) through (20) and included as enhancement factor (1) that "the offense was an act of terrorism, or was related to an act of terrorism."

not have] property destroyed by the perpetrator of the crime." State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994); see also State v. Cowan, 46 S.W.3d 227, 235-36 (Tenn. Crim. App. 2000) (holding that others present when the defendant attacked the victim were not "victims" as contemplated by Tennessee Code Annotated section 40-35-114(3) because they "had no physical contact with the defendant during the commission of the crime, nor was any property taken from them"). Because the defendants received separate convictions for each victim and because the children do not qualify as "victims," the trial court's application of this factor was erroneous.

The defendants also contend, and the state concedes, that the trial court erred by applying enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high, to the convictions for aggravated robbery and especially aggravated kidnapping. This factor should not have been used to enhance those convictions because "there is necessarily a high risk to human life and the great potential for bodily injury whenever a deadly weapon is used." State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994) (citing State v. Hill, 885 S.W.2d 357, 363 (Tenn. Crim. App. 1994); State v. Hicks, 868 S.W.2d 729, 732 (Tenn. Crim. App. 1993)).

The defendants also complain that the trial court should have applied in mitigation Tennessee Code Annotated section 39-13-305(b)(2), which provides that "[i]f the offender voluntarily releases the victim alive or voluntarily provides information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing." In this case, however, the defendants did not release the victims but actually left them in their apartment bound with duct tape. While they eventually escaped, this is not the equivalent of a voluntary release. See State v. Taylor, 63 S.W.3d 400, 412 (Tenn. 2001); State v. Nesha Newsome, No. W2002-01306-CCA-R3-CD (Tenn. Crim. App., at Nashville, Dec. 30, 2003).

In summary, the trial court should not have applied enhancement factor (3), that the offense involved more than one victim, to any of the convictions. Additionally, factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high, should not have been applied to the convictions for aggravated robbery or especially aggravated kidnapping. The trial court appropriately applied enhancement factors (1), that the defendant has a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate range, (13), that the defendant was on bail (Fuller) or parole (Betty), and (16), that the crime was committed under circumstances under which the potential for bodily injury to a victim was great, to each of the convictions.[2] In addition, the trial court correctly determined that there were

---

[2]The United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. ___ , 2004 U.S. LEXIS 4573 (2004), calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. Id. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." Id., at **13-14 (emphasis in original). Finally, the Court concluded that "every defendant has a *right*

(continued...)

no applicable mitigating factors. Under these circumstances, it is our view that the sentences imposed by the trial court were justified.

Finally, each of the defendants asserts that the trial court erred by imposing consecutive sentences. Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), our high court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

Taylor, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[3] exist:

> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

---

[2](...continued)
to insist that the prosecutor prove to a jury all facts legally essential to the punishment." Id., at *31 (emphasis in original).

In any event, the application of enhancement factors (1) and (13) would not violate the rule established in Apprendi because factor (2) is based upon prior criminal convictions and factor (13) was admitted by each defendant in this case. See Apprendi, 566 U.S. at 490. Moreover, neither defendant has contested on appeal the application of enhancement factor (16). In consequence, it remains our view that the sentences imposed by the trial court were warranted under the circumstances.

[3]The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

The trial court ordered consecutive sentences on the following grounds:

This [c]ourt is of the opinion, having heard this whole case, that, in this case, under Section 40-35-115, which has to do with multiple convictions, that both of these defendants are offenders whose record of criminal activity is extensive. [Each] of these defendants is a . . . person that this [c]ourt consider[s], based on the circumstances and the evidence in this case with the Woods, a person who is a dangerous offender whose behavior indicates little or no regard to human life and no hesitation about committing a crime in which the risk to human life is very high.

I, also, find that they were . . . on . . . parole and bail. So I think the . . . consecutive sentences can apply in this particular case.

In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The Wilkerson decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." 905 S.W.2d at 938.

In determining that each of the defendants qualified for consecutive sentencing, the trial court failed to specifically find that an extended sentence reasonably related to the severity of the offenses

and was necessary to protect the public against further criminal conduct by the defendants. Ordinarily, a remand or a modification of the sentence would be in order. The record, however, establishes that consecutive sentencing is appropriate. The defendants, both armed, forced their way into the Woods residence with the intent to rob the victims, creating a particularly dangerous situation. See Timothy Allen Moore, No. M2000-02933-CCA-R3-CD (Tenn. Crim. App., at Nashville, Jan. 11, 2002) ("[Armed robbery] is a very serious crime, against which little protection is possible, and those who commit armed robberies upon innocent [victims] are, almost by definition, 'dangerous offenders.'"). Two children, one only ten days old, were present. Everyone was at risk. Moreover, the record establishes that Fuller was on bail and Betty was on parole at the time of the offenses. Both have extensive criminal histories. In our view, the defendants' behavior demonstrated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The effective sentences reasonably relate to the seriousness of the offenses. In addition, the aggregate sentences are necessary to protect the public from the defendants.

Accordingly, the judgments for aggravated burglary, aggravated robbery, especially aggravated kidnapping of Mr. Woods, evading arrest, and reckless endangerment are affirmed. Each defendant's conviction for the especially aggravated kidnapping of Ms. Woods is reversed and dismissed pursuant to the rule in State v. Anthony. The effective sentence for each defendant should remain the same.

_____
GARY R. WADE, PRESIDING JUDGE